United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEGACORP LOGISTICS LLC,<br>　　　　Plaintiff,<br>　　v.<br>TURVO, INC., et al.,<br>　　　　Defendants. | Case No. 18-cv-01240-EMC<br><br>**ORDER GRANTING DEFENDANTS'**<br>**MOTION TO COMPEL ARBITRATION**<br><br>Docket No. 52 |

　　　　Plaintiff MegaCorp Logistics, LLC ("Mega") has sued two companies with whom it once had a business relationship, namely, Turvo, Inc. and Pacific Sky Group, LLC ("Pacific"). The gist of Mega's complaint is that Defendants had access to Mega's trade secrets and confidential information during the business relationship and, after the business relationship ended, Defendants used Mega's trade secrets and confidential information to develop a product that they then offered to Mega's competitors. Mega has asserted the following claims against Defendants: (1) breach of a Nondisclosure Agreement; (2) breach of a Letter of Understanding; (3) misappropriation of trade secrets; (4) tortious interference with business relationships; (5) unjust enrichment; and (6) negligent misrepresentation.

　　　　Currently pending before the Court is Defendants' motion to compel arbitration.[1] The motion to compel arbitration is based on an arbitration provision in a Consulting Services Agreement entered into by the parties. The Consulting Services Agreement is a contract different and separate from the Nondisclosure Agreement and Letter of Understanding referenced above. While the Consulting Services Agreement has an arbitration clause, the Nondisclosure Agreement

---

[1] At the hearing on the motion to compel arbitration, the Court granted Defendants' motion to stay discovery pending a ruling on the motion to compel arbitration. *See* Docket No. 53 (motion).

1 and Letter of Understanding do not.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** Defendants' motion.

### I.  FACTUAL & PROCEDURAL BACKGROUND

A. Parties

   1. Mega

Mega is a company that "provides freight brokerage services throughout the continental United States." FAC ¶ 8. More specifically, Mega "brings together loads of freight for producers, suppliers, manufacturers, and other entities ('Customers') with over-the-road motor transportation companies available to move the freight ('Carriers')." FAC ¶ 8. As part of its business, Mega uses a proprietary transportation management software system known as "TMS." *See* FAC ¶¶ 16, 27, 32, 34, 36.

During the relevant period, Mega's Vice President was Robert Klare. *See* FAC ¶ 42. Mr. Klare is currently Mega's president. *See* Klare Decl. ¶ 1.

   2. Pacific and Turvo

Pacific and Turvo are affiliated companies. Pacific was created in June 2014 and its managing member is Eric Gilmore. *See* Gilmore Reply Decl. ¶¶ 1-2. According to Mr. Gilmore, in the summer of 2014, he "was working on building a new software company focused on the supply chain and logistics industry." Gilmore Reply Decl. ¶ 2. That new company became Turvo. *See* Gilmore Reply Decl. ¶ 5; *see also* FAC ¶ 2 (alleging that "Turvo operates a collaborative logistics software platform that connects shippers, brokers, and carriers for purposes of freight management"). It appears that Turvo was incorporated in or about September 2014. *See* FAC ¶ 65. Mr. Gilmore is the co-founder and CEO of Turvo. *See* Gilmore Reply Decl. ¶ 2.

B. Parties' Business Relationship

While the parties do not dispute that they once had a business relationship, they differ as to what the exact nature of that relationship was. According to Mega, there were two aspects to that relationship: (1) the parties had a joint venture pursuant to which Defendants would rely on Mega's expertise in the freight brokerage business to develop a new freight brokerage software

application that Mega would ultimately be able to use for its own benefit and (2) the parties had a contract independent of the joint venture, *i.e.*, the Consulting Services Agreement, pursuant to which Defendants would maintain Mega's existing transportation management software system known as "TMS."

According to Defendants, the parties never entered into a joint venture; rather, Defendants simply saw Mega as being a potential customer of the software program/platform that they were working on. While Defendants acknowledge that the parties did enter into the Consulting Services Agreement, they maintain that it involved more than just maintenance of the existing TMS. According to Defendants, the Consulting Services Agreement was also intended to facilitate Mega's transition to Defendants' new software platform – indeed, by its express terms, the agreement involved migrating Mega's data to the new software platform Defendants were developing.

The following evidence has been submitted to the Court with respect to the parties' business relationship: (1) a Nondisclosure Agreement; (2) the Consulting Services Agreement; (3) a Letter of Understanding; and (4) a proposed Letter of Intent and proposed Platform Services Agreement (never signed).[2]

1. Nondisclosure Agreement

Prior to beginning the business relationship, the parties contemplated a Nondisclosure Agreement. *See* Gilmore Reply Decl., Ex. A (email, dated September 1, 2014) (Defendants sending a Nondisclosure Agreement to Mega). The Nondisclosure Agreement stated that it was effective as of September 2, 2014, and that it would expire in two years, although obligations under the agreement would survive for five years. *See* NDA ¶ 7. Under the agreement, each party's confidential information would be maintained in confidence and would not be "use[d] . . . for any purpose other than evaluating or pursuing a business relationship between the parties."

---

[2] The Court notes that the first three contracts were all purportedly between Mega and Pacific only – *i.e.*, Turvo was not a contracting party. However, the parties agree that they operated under the understanding that any contract between Mega and Pacific also involved Turvo. Thus, for convenience, the Court refers to both Defendants (and not just Pacific) as contracting parties with Mega.

3

NDA ¶ 2.

According to Mega, the parties actually signed the Nondisclosure Agreement and the purpose of the NDA was to facilitate the exchange of confidential information for purposes of the joint venture. According to Defendants, they did not sign the Nondisclosure Agreement but, in any event, the NDA was not connected to a joint venture, but instead was intended to allow Defendants to pitch to Mega the software program/platform they were developing.

2. <u>Consulting Services Agreement</u>

As noted above, the parties agree that they entered into a Consulting Services Agreement. They entered into the contract in late October 2014, but the effective date was earlier – September 25, 2014 (*i.e.*, shortly after the Nondisclosure Agreement's stated effective effect). The contract provided that it would "continue until terminated as provided herein" (*e.g.*, upon written notice or breach by a party). CSA ¶ 10.1.

Under the Consulting Services Agreement, Defendants would "perform the services described in the applicable statement of work . . . and create and deliver certain deliverables identified as such in the applicable statement of work." CSA ¶ 1.1. In exchange, Mega would pay Pacific "for the Services in accordance with the applicable SOW." CSA ¶ 3.1.

Notably, the contract included a confidentiality provision:

> The parties agree, both during and for a period of five (5) years following the termination of this Agreement, not to disclose any of the other party's Confidential Information (defined below) to any third party and to take all reasonable precautions to prevent its unauthorized dissemination. For purposes of this Agreement and any SOW, the term 'Confidential Information' means information which (b) relates to the disclosing party's past, present and future research, development, business activities, products, software, services, and technical knowledge, provided such information has been identified as confidential or would be understood to be confidential by a reasonable person under the circumstances, and (b) [Mega's] Proprietary Materials, and (c) [Defendants'] Consultant Property.

CSA ¶ 5.1. Mega's Proprietary Materials included TMS as well as, *inter alia*, its client information, business plans, pricing information, and financial or accounting information. *See* CSA ¶ 4.1.

The Consulting Services Agreement also included an arbitration provision. Under that

4

provision, the following was subject to arbitration: "Any dispute, claim, or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate." CSA ¶ 11.

It appears that the parties entered into only one Statement of Work pursuant to the Consulting Services Agreement. The Statement of Work contemplated that Defendants would assist in supporting Mega's existing TMS. *See* First SOW ¶ 1. However, the Statement of Work also contemplated that Defendants would migrate Mega's data to a new software platform. *See* First SOW ¶ 2.1. The estimated timeline for the service activities under the Statement of Work was October 2014 through May 2015. *See* First SOW ¶ 2.3.

In or about December 2014, the Statement of Work was amended via a Change Order. Before the Change Order was signed, Defendants sent Mega an email regarding the Change Order. The email noted, *inter alia*, that, under the Change Order, Defendants would be doing "data migration work including building a data sync service" to move Mega's data over to Defendants' new software platform. Gilmore Reply Decl., Ex. D (email). The Change Order reflected the same. *See* Change Order ¶ 2.1 (covering deliverables; mentioning both data migration and data sync). It also provided that the estimated timeline for the service activities was from October 2014 through February 2015. *See* Change Order ¶ 2.2.

3. Letter of Understanding

The Letter of Understanding is dated early October 2014, *i.e.*, before the Consulting Services Agreement was signed. The letter provided that

> all code and documentation regarding [Mega's] "Transportation management software system" utilized in discovery and analyses for the purpose of finalizing the "Consulting Services Agreement" between the two parties may not be reused or sold without the written permission of [Mega]. All code that is part of the "Transportation management software system" specified in the scope of work provided to [Pacific] as part of the "Consulting Services Agreement" and code modified or developed as part of the deliverables in the scope of work for the "Transportation management software system" may not be reused or sold without the written permission of [Mega].

LOU at 1. Although the Letter of Understanding is signed, Defendants disavow that their

5

representative (Mr. Gilmore) actually signed the letter.

    4.    <u>Proposed Letter of Intent and Proposed Platform Services Agreement</u>

In late June 2015, Defendants sent Mega an email, attached to which was a proposed Letter of Intent. The proposed Letter of Intent stated that Turvo and Mega

> have entered into negotiations of an agreement whereby Turvo will provide [Mega] with a software platform service. The purpose of this letter is to set out the principal terms and conditions of the Platform Services Agreement ("PSA") upon which both parties agree to enter into.
>
> The terms in this letter are not exhaustive and are expressly 'subject to contract' until a final written agreement has been entered into. The terms are not intended to be legally binding between the parties except where specifically stated. The Parties agree to negotiate in good faith with a view to signing the final written Proposed Platform Service Agreement.

Klare Decl., Ex. 4 (proposed LOI). One of the terms of the Letter of Intent was as follows: "Each party continues to be bound by the separately executed Mutual Non-Disclosure Agreement as it relates to Confidential Information." Klare Decl., Ex. 4 (proposed LOI).

Several months later, in October 2015, Defendants sent Mega an email, this time attaching the proposed Platform Services Agreement. Under the proposed contract, "Turvo will provide [Mega] access to the Platform Services through the Internet." Klare Decl., Ex. 5 (Prop. PSA ¶ 1.1). The proposed contract contained a confidentiality provision, *see* Klare Decl., Ex. 5 (Prop. PSA ¶ 5.2), but not an arbitration provision.

The proposed Letter of Intent and proposed Platform Services Agreement were never signed. According to Mega, it began to be concerned about whether Defendants were able "to produce a working model of [the] software." FAC ¶ 107. Mega was also concerned about Defendants' use and deployment of the software. *See* FAC ¶ 108. These concerns ultimately led Mega to withdraw from the parties' business relationship. *See* FAC ¶ 113. According to Mega, after the business relationship ended, Defendants continued to use Mega's trade secrets and confidential information to develop their software product which they then offered to Mega's competitors.

C. <u>Claims</u>

Mega has asserted the following claims against Defendants: (1) breach of the Nondisclosure Agreement; (2) breach of the Letter of Understanding; (3) misappropriation of trade secrets; (4) tortious interference with business relationship; (5) unjust enrichment; and (6) negligent misrepresentation.

Mega has sued for breach of contract with respect to only two out of the three contracts at issue between the parties. More specifically, while Mega asserts claims for breach of contract based on the Nondisclosure Agreement and Letter of Understanding (both of which Defendants claim they never signed), it has not asserted a claim for breach of the Consulting Services Agreement and the related Statement of Work and Change Order. Defendants argue that this is simply an attempt by Mega to avoid the arbitration clause contained in the Consulting Services Agreement, as neither the Nondisclosure Agreement nor the Letter of Understanding contains an arbitration provision.

## II. DISCUSSION

A. <u>Legal Standard</u>

The parties agree that the pending motion is governed by the Federal Arbitration Act ("FAA"). Under the FAA, "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

> Generally, "the [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Certain issues, however, are presumptively reserved for the court. These include "gateway" questions of arbitrability, such as "whether the parties have a valid arbitration agreement or are bound by a given arbitration clause, and whether an arbitration clause in a concededly binding contract applies to a given controversy."
>
> However, parties may delegate the adjudication of gateway issues to the arbitrator if they "clearly and unmistakably" agree to do so.

*Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*, 862 F.3d 981, 985 (9th Cir. 2017); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (noting that "the question 'who has

7

the primary power to decide arbitrability' turns upon whether the parties agreed about *that* matter[;] [d]id the parties agree to submit the arbitrability question itself to the arbitration?") (emphasis in original).

Courts in this District have held that, "[i]n cases where the parties 'clearly and unmistakably intended to delegate the power to decide arbitrability to an arbitrator,' the district court's inquiry is 'limited . . . [to] whether the assertion of arbitrability is "wholly groundless."'" *Zenelaj v. Handybook Inc.*, 82 F. Supp. 3d 968, 975 (N.D. Cal. 2015) (Henderson, J.).

B.  <u>Delegation to Arbitrator to Decide Arbitrability</u>

According to Defendants, all claims in this case are subject to arbitration because they all "relat[e] to" the Consulting Services Agreement. CSA ¶ 11. Defendants also argue that, while arbitrability is usually determined by a court in the first instance, here, the parties had a clear and unmistakable agreement to delegate the power to decide arbitrability to the arbitrator. Mega disagrees.

As noted above, the only contract at issue that contains an arbitration provision is the Consulting Services Agreement. That provision states as follows: "Any dispute, claim, or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation, or validity thereof, *including the determination of the scope or applicability of this Agreement to arbitrate*, shall be determined by a mutually agreed upon arbitrator." CSA ¶ 11 (emphasis added).

Defendants correctly point out that, in *Momot v. Mastro*, 652 F.3d 982 (9th Cir. 2011), the Ninth Circuit held that language similar to the above was a clear and unmistakable agreement to delegate. In *Momot*, the arbitration provision – which was contained in § 4 of the contract at issue – stated as follows: "'If a dispute arises out of or relates to this Agreement, the relationships that result from this Agreement, the breach of this Agreement *or the validity of application of any of the provisions of this Section 4*, and, if the dispute cannot be settled through negotiation, the dispute shall be resolved exclusively by binding arbitration.'" *Id.* at 988 (emphasis added). The Ninth Circuit held that "this language, delegating to the arbitrators the authority to determine 'the validity or application of any of the provisions of' the arbitration clause, constitutes 'an agreement

8

to arbitrate threshold issues concerning the arbitration agreement.' In other words, the parties clearly and unmistakably agreed to arbitrate the question of arbitrability." *Id.*

In light of *Momot*, the Court finds that there was, in the instant case, a clear and unmistakable delegation to the arbitrator. Mega's arguments to the contrary are unavailing. For example, Mega contends that there was no clear and unmistakable delegation because the Consulting Services Agreement also contains a provision that is contrary to arbitration – more specifically, a provision stating that, if any provision of the contract is held by a court of competent jurisdiction to be unenforceable, then the validity of the remaining provisions shall not be affected. *See* CSA ¶ 13.8. However, the Ninth Circuit rejected a similar argument in *Mohamed v. Uber Technologies, Inc.*, 848 F.3d 1201 (9th Cir. 2016). In *Mohamed*, the Court acknowledged that the contract at issue contained a venue provision granting state or federal courts in San Francisco exclusive jurisdiction over any disputes arising out of or in connection with the contract, but held that this did not make an express delegation to an arbitrator ambiguous: "It is apparent that the venue provision . . . was intended" for the purpose of allowing a party to file an action in court to enforce an arbitration agreement or to obtain a judgment enforcing an arbitration award, as well as "to identify the venue for any other claims that were not covered by the arbitration agreement." *Id.* at 1209. "That does not conflict with or undermine the agreement's unambiguous statement identifying arbitrable claims and arguments." *Id.* Accordingly, reference to a court of competent jurisdiction in one provision in the Consulting Services Agreement does not render the delegation clause of the arbitration provision ambiguous.

That being said, *Momot* does not require that the Court automatically turn over the instant case to arbitration because, as noted above, this Court may still make a limited inquiry as to whether Defendants' assertion of arbitrability is wholly groundless. *See Zenelaj*, 82 F. Supp. 3d at 975. Accordingly, the Court addresses below whether the claims asserted by Mega in its FAC arguably fall within the scope of the arbitration provision in the Consulting Services Agreement. The Court focuses on the main claims alleged in the FAC – *i.e.*, the claims for breach of the Nondisclosure Agreement and the Letter of Understanding and the claim for trade secret misappropriation. The remaining claims (*i.e.*, tortious interference with business relationships,

9

unjust enrichment, and negligent misrepresentation) are essentially dependent on the above claims.

C. <u>Breach of the Letter of Understanding</u>

The claim for breach of the Letter of Understanding is clearly arbitrable. As reflected above, the evidence provided by the parties reflects as follows:

- The Nondisclosure Agreement was signed (or allegedly signed) on September 2, 2014, with an effective date of September 2, 2014.
- The Consulting Services Agreement was signed on October 27, 2014, but with an effective date about a month earlier, *i.e.*, September 25, 2014.
- The Letter of Understanding was signed (or allegedly signed) on October 8 and 9, 2014 – *i.e.*, before the Consulting Services Agreement was formally signed.
- On its face, the Letter of Understanding was tied to the not-yet formalized Consulting Services Agreement: "Both parties agree that all code and documentation regarding [Mega's] 'Transportation Management System Software' utilized in discovery and analyses for the purpose of finalizing the 'Consulting Services Agreement' between the parties may not be reused or sold without the written permission of [Mega]. All code that is part of the 'Transportation Management System Software' specified in the scope of work provided to [Pacific] as part of the 'Consulting Services Agreement' and code modified or developed as part of the deliverables in the scope of work for the 'Transportation Management System Software' may not be reused or sold without the written permission of [Mega]." LOU at 1.
- As reflected by the language in the Letter of Understanding, the purpose of the letter was to bridge a gap (*i.e.*, ensure no misappropriation and protect intellectual property rights) before the Consulting Services Agreement was formally signed. And, arguably, once the Consulting Services Agreement was formally signed, it superseded the Letter of Understanding. *See* CSA ¶ 13.2 ("This Agreement supersedes all existing agreements . . . between the parties relating to this Agreement . . . .").

Given the above, the claim for breach of the Letter of Understanding is clearly "relate[d] to" the Consulting Services Agreement and thus subject to arbitration by its terms thereunder.

CSA ¶ 11. Thus, it is not wholly groundless for Defendants to seek arbitration on the claim.

D. <u>Trade Secret Misappropriation</u>

Defendants' assertion that the trade secret misappropriation claim is arbitrable also is not wholly groundless – especially in light of how the claim is currently pled in the FAC. Paragraph 148 in the FAC is an allegation that falls under the cause of action for trade secret misappropriation. Paragraph 148 states that, "*[a]s a consultant of [Mega]*, Defendants had access to and knowledge of . . . confidential business information," FAC ¶ 148 (emphasis added), which included "information pertaining to [Mega's] pricing, services, personnel, customer lists, motor carrier lists, [and] proprietary software, including the Source Code." FAC ¶ 146. Source Code refers to the software code and technology which formed the basis for Mega's TMS. *See* FAC ¶ 27. Because the trade secret misappropriation claim – as pled – refers to information that Defendants were exposed to as consultants, Defendants fairly contend that the claim is related to the Consulting Services Agreement.

Moreover, even if Mega were to amend its complaint to drop the phrase "as a consultant" and specifically tie the misappropriation claim to the Nondisclosure Agreement, it would fare no better for the reasons discussed below.

E. <u>Breach of the Nondisclosure Agreement</u>

According to Mega, the claim for breach of the Nondisclosure Agreement is not arbitrable because the Nondisclosure Agreement does not contain an arbitration clause, and the arbitration clause in the Consulting Services Agreement cannot apply to the Nondisclosure Agreement because the Nondisclosure Agreement is a separate and independent contract. Mega maintains that the Nondisclosure Agreement is a separate and independent contract because the Nondisclosure Agreement is related to the parties' joint venture, *i.e.*, Defendants' development of a new software platform, while the Consulting Services Agreement concerns Defendants' provision of a discrete service, *i.e.*, that of maintaining Mega's existing TMS.

In support of its position, Mega cites *International Ambassador Programs v. Archexpo*, 68 F.3d 337 (9th Cir. 1995). There, the plaintiff Ambassador was a nonprofit corporation that arranged tours and informational visits in foreign countries, including Russia. It organized tours

11

under two separate divisions: (1) Citizen Ambassador Program (CAP) and (2) State Leadership Initiative (SLI). The defendant Archexpo was a Russian company that facilitated and expedited tours such as those sponsored by Ambassador in Russia and other Soviet republics.

Ambassador and Archexpo entered into several agreements related to tours in Russia. The two at issue were: (1) an April agreement that called for Archexpo to perform services in connection with Ambassador's CAP tours; and (2) a July agreement that dealt with visits by state delegations under Ambassador's SLI program. Only the April agreement had an arbitration clause; the July agreement did not. The Ninth Circuit was called upon to address whether the arbitration clause in the April agreement encompassed any subsequent contracts between the parties, including the July agreement.

The court began by noting that,

> [i]f the July agreement is a discrete agreement, the lack of an arbitration clause means disputes over the agreement are not subject to arbitration. On the other hand, if the two agreements are merely interrelated contracts in an ongoing series of transactions, as Archexpo contends, Ambassador should have submitted its claim under the July agreement to . . . arbitration.

*Id.* at 340. Ultimately, the Ninth Circuit held that

> [t]here is substantial evidence that the April and July agreements are independent and that the arbitration clause in the April agreement does not control the separate agreements of the parties. The agreements concern two separate types of tours [*i.e.*, CAP and SLI] and completely different groups of tourists. The July agreement contains no arbitration clause, indicating an intent to treat it differently than the April agreement. Moreover, the proof necessary to establish Archexpo's Moscow arbitration claims under the April agreement has nothing to do with the dispute under the July agreement.

*Id.*

The instant case, however, is materially distinguishable from *Ambassador*. In *Ambassador*, the separateness of the contracts was easy to discern: The contracts concerned two different tours under two different programs and involved two different time periods. In contrast, in the instant case, there is significant overlap between the Nondisclosure Agreement and the Consulting Services Agreement. For example, there is an overlap in time: The Nondisclosure

12

Agreement became effective in early September 2014 and lasted for two years (although obligations under the agreement would survive for five years); the Consulting Services Agreement became effective in late September 2014 and, by its terms, continued in effect until an act of termination (*e.g.*, written notice by a party or breach by a party). Even if the Court were to look only at the Statement of Work rather than the broader Consulting Services Agreement, there would still be overlap in time because the Statement of Work had an estimated timeline of October 2014 to May 2015; upon the signing of the Change Order, the estimated timeline was October 2014 through February 2015.

Not only is there an overlap in time between the Nondisclosure Agreement and the Consulting Services Agreement, there is also an overlap in subject matter. While Mega claims that the Consulting Services Agreement was completely separate and independent from the (alleged) joint venture, the face of the Consulting Services Agreement indicates otherwise. More specifically, the Statement of Work for the Consulting Services Agreement, as well as the Change Order that followed, indicated that the scope of Defendants' work for Mega included migrating Mega's data to a new software platform – *i.e.*, the platform that was the subject of the (alleged) joint venture.

Finally, that the Nondisclosure and Consulting Services Agreement are interrelated is supported by the fact that Mega shared information with Defendants pursuant to *both* agreements. Mega has failed to show that it is possible to parse out whether information was shared under the Nondisclosure Agreement only (as opposed to the Consulting Services Agreement or both the Consulting Services Agreement and the Nondisclosure Agreement).[3]

Notably, in its papers, Mega pointed to only three examples where information was (allegedly) shared under the Nondisclosure Agreement only. According to Mega, it shared information with Defendants in April, June, and July 2015,[4] and this information sharing had to

---

[3] If there was information sharing either wholly or partly because of the Consulting Services Agreement, then the information sharing would be "relate[d] to" the Consulting Services Agreement. CSA ¶ 11.

[4] Mega maintains that, "[o]n two separate occasions in April and June 2015, at [Defendants'] request, [Mega] hosted [Defendants] at its corporate offices in Wilmington, North Carolina and

13

have been based on the Nondisclosure Agreement only because, by February 2015, Defendants had completed their work under the Consulting Services Agreement's Statement of Work. But it is not clear that Defendants did in fact finish their work, as Mega claims, in or about February 2015. As Defendants point out, the Statement of Work simply *estimated* that work would be completed at that time, and Defendants have provided evidence that work was still taking place in March 2015. *See* Gilmore Reply Decl., Ex. E (email). Even assuming that work under the Statement of Work was completed in March 2015, the Consulting Services Agreement had not yet terminated, and, in any event, Mega has made no showing that whatever information was shared in April, June, and July 2015 was different from that which was already shared through Defendants' work under the Consulting Services Agreement. In short, it would be extremely difficult to parse out which confidential information would be covered by the Nondisclosure Agreement only as opposed to being covered by the Consulting Services Agreement as well.

Accordingly, the Court finds that it is not wholly groundless for Defendants to take the position that the claim for breach of the Nondisclosure Agreement is arbitrable because there is a fair argument that the Nondisclosure Agreement and the Consulting Services Agreement are "interrelated contracts" within the meaning of *Ambassador*. *Goodrich Cargo Systems v. Aero Union Corp.*, No. C 06-06226 CRB, 2006 U.S. Dist. LEXIS 93680 (N.D. Cal. Dec. 14, 2006), one of the main cases on which Mega relies, does not alter the Court's analysis. In *Goodrich*, the plaintiff agreed to buy a business from the defendant and thus executed an asset purchase agreement. As an attachment to that agreement, the parties appended a manufacturing license agreement, "[t]he purpose of [which] was to create a licensing arrangement such that Defendant would continue to operate a portion of the APS Business." *Id.* at *2. The plaintiff brought claims under both agreements, and the defendant moved to compel all claims even though only the license agreement had an arbitration clause. According to the defendant, "the APA and the MLA

---

allowed them unfettered access to all of [its] departments, employees, and operations to observe and gather information." Klare Decl. ¶ 14. In addition, in July 2015, Defendants "conducted a two-day site visit with [Mega] at its Covington, Kentucky operation's center," during which Mega gave Defendants "information on [its] TMS, carrier setup procedures, claims procedures, system policies, accounting processes, night dispatch procedures, email configuration, and Electronic Data Information configuration among other matters." Klare Decl. ¶ 15.

14

1 were executed together as part of an integrated business transaction and [thus] the MLA's binding

2 arbitration clause . . . encompasses any disputes related to that business transaction." *Id.* at *5.

3 Judge Breyer disagreed.

> Just because the parties enacted multiple agreements in connection with the acquisition of the APS Business does not mean that this Court may ignore the fact that there are *discrete agreements pertaining to different facets of the transaction*. Here, the parties executed two distinct agreements. The first agreement, the APA, governs Plaintiff's acquisition of certain assets owned by Defendant. The second agreement, the MLA governs a smaller aspect of the transaction – namely, a licensing arrangement whereby Defendant agreed to continue operating a portion of the business unit it sold. Only the latter agreement contains an arbitration clause, and it follows that the arbitration clause only applies to disputes as to those aspects of the transaction that are actually covered by the latter agreement.

*Id.* at *6 (emphasis added).

According to Mega, the instant case is analogous to *Goodrich*; the Nondisclosure Agreement in particular was directed at a joint venture between the parties whereas the Consulting Services Agreement had a different subject matter – a discrete set of consulting services. But, as discussed above, Mega's position is problematic in that there is overlap in subject matter between the Nondisclosure Agreement and the Consulting Agreement. Moreover, the instant case is different from *Goodrich* in that, even if the Nondisclosure Agreement and Consulting Agreement may have been directed at different facets of the business relationship between the parties, the disputes related to the agreements are the same – *i.e.*, whether information that Mega shared with Defendants was improperly used. Mega has failed to show that its claim for breach of the Nondisclosure Agreement is predicated on information that was shared solely under the Nondisclosure Agreement and not covered under the Consulting Services Agreement. The substantial overlap both in terms of the transactions, as well as to the documents covered by the two agreements demonstrate a fair argument that the arbitration clause which is broadly drafted applies and that the assertion of arbitrability is not wholly groundless.

### III. CONCLUSION

For the foregoing reasons, the Court holds as follows: (1) the arbitration clause in the Consulting Services Agreement clearly and unmistakably delegates the power to determine

arbitrability of a claim to the arbitrator; (2) Defendants' assertion of arbitrability with respect to all claims, including the claim for breach of the Nondisclosure Agreement, is not wholly groundless; (3) therefore, the Court grants Defendants' motion to compel arbitration. The issue of arbitrability is one for the arbitrator to decide.

At the hearing on the motion to compel arbitration, the Court stayed discovery pending a decision on the motion. Now that the Court has granted the motion, all proceedings in this case – including discovery – are stayed pending the arbitration.

This order disposes of Docket Nos. 52 and 53.

**IT IS SO ORDERED**.

Dated: July 30, 2018

_____
EDWARD M. CHEN
United States District Judge